122 Cal.App.3d 905 (1981)
176 Cal. Rptr. 365
INSURANCE COMPANY OF NORTH AMERICA, Petitioner,
v.
WORKERS' COMPENSATION APPEALS BOARD and MYRNA R. KEMP, Respondents.
Docket No. 60977.
Court of Appeals of California, Second District, Division Two.
August 24, 1981.
*907 COUNSEL
Booth, Mitchell, Strange & Smith and James Ruiz for Petitioner.
Schermer & Rand, Jack Goodchild and Jeffrey Anson for Respondents.
OPINION
ROTH, P.J.
Petitioner Insurance Company of North America (hereinafter INA) contends that respondent Workers' Compensation Appeals Board (WCAB) erred in denying INA's petition for reconsideration of the decision of the workers' compensation judge finding that (1) respondent Myrna R. Kemp (applicant) sustained injury to her psyche arising out of and occurring in the course of employment for Volt Technical Corporation (Volt), and (2) INA, the workers' compensation insurance carrier for Volt, unreasonably refused to provide workers' compensation benefits to applicant and therefore is liable for a 10 percent penalty pursuant to Labor Code section 5814. We agree with INA's contention and accordingly we cannot accept the decision of the WCAB.
As stated in her original application for adjudication filed with the WCAB, the gravamen of applicant's claim to industrial psychiatric injury is that she sustained emotional trauma as the result of employment *908 "harassment, pressures and tensions from November 28, 1978 to present and continuing...."
The application which initiates this proceeding is based upon a false representation. Paragraph 9 thereof reads: "This application is filed because of a disagreement regarding liability for [the psychic injury]:...." This is a false statement. Volt did not know applicant had suffered an injury. There had been no discussion between applicant and Volt with respect to an injury or to her claim. Volt did not know applicant was making a claim until the application as it shows on its face was served on Volt on or about December 22, 1978. Some weeks after that date, abortive efforts were made by applicant's counsel to reach some agreement for payments on account of applicant's claim. There is nothing in the record to show that Volt had any information with respect to said claim at the time of the aborted discussions except such as is contained in the served application. On August 1, 1979, Volt filed an answer denying it.
The application dated November 30, 1978, was prepared and typed in all respects except for applicant's signature by attorneys for applicant and executed at Sherman Oaks. It bears the stamped seal of Schermer & Rand, Inc. The application does not describe applicant's injury. After the printed words, "The injury occurred as follows:" are the words, "harassment, pressures and tensions." Both documents were filed by Schermer & Rand, Inc. at WCAB offices in Panorama City on December 1, 1978. Concurrently, counsel prepared a declaration of readiness to proceed.
On November 29, 1978, applicant was tested and interviewed by Dr. Albert J. Rosenstein, a psychologist who maintains an office in Encino, California. We assume Schermer & Rand had a report from Dr. Rosenstein before they prepared and completed the application. If such report was in writing before the application was filed or since, it was not filed or made a part of the record at any time.
In a "Claim Statement of Employee" signed and filed by applicant on or about December 15, 1978, with the Employment Development Department she fixed the commencement of her right to a claim as November 28, 1978, the date of her termination but stated the last day she worked before disability as November 24, 1978. In answer to the question in the claim statement of December 15, "Did you stop work because of sickness or injury? If `No,' please give reason," applicant answered *909 "No" and wrote as her reasons "TERMINATED." And in answer to question 2, "What was the first full day you were too sick to work ...?", she replied, November 28, 1978. November 28, 1978, as the date of commencement of disability is again confirmed by a doctor's certificate signed and filed on December 7, 1978, (discussed infra).
"[J]udicial review of decisions of the WCAB on factual matters is limited to determining whether the decision, based on the entire record, is supported by substantial evidence ([Lab. Code] § 5952, subd. (d); LeVesque v. Workmen's Comp. App. Bd. (1970) 1 Cal.3d 627 [83 Cal. Rptr. 208, 463 P.2d 432])." (Southern California Rapid Transit Dist., Inc. v. Workers' Comp. Appeals Bd. (1979) 23 Cal.3d 158, 162 [151 Cal. Rptr. 666, 588 P.2d 806].) "`The foregoing standard is not met "by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence."' (Lamb v. Workmen's Comp. Appeals Bd. [(1974) 11 Cal.3d 274,] at p. 281; Garza v. Workmen's Comp. App. Bd., 3 Cal.3d 312, 317 [90 Cal. Rptr. 355, 475 P.2d 451]; Greenberg v. Workmen's Comp. Appeals Bd., 37 Cal. App.3d 792 [112 Cal. Rptr. 626].)" (Universal City Studios, Inc. v. Workers' Comp. Appeals Bd. (1979) 99 Cal. App.3d 647, 656 [160 Cal. Rptr. 597].)
In LeVesque v. Workmen's Comp. App. Bd. (1970) 1 Cal.3d 627 [83 Cal. Rptr. 208, 463 P.2d 432], our Supreme Court stated: "In reviewing the evidence our legislative mandate and sole obligation ... is to review the entire record to determine whether the board's conclusion was supported by substantial evidence." (Id., at p. 637.)
"Le Vesque (1 Cal.3d, pp. 635-637) specifically rejected earlier judicial declarations that an award of the board must be sustained, if supported by `any evidence' [citations], or `any substantial evidence' [citations]. Although such a rule may continue in other fields of our law, in workmen's compensation cases a reviewing court is no longer mandated to inquire only `whether there is substantial evidence in favor of the respondent'; and then if such is found, `no matter how slight it may appear in comparison with the contradictory evidence,' be bound to affirm the decision under review. [Citations.]" (Hulbert v. Workmen's Comp. Appeals Bd. (1975) 47 Cal. App.3d 634, 638 [121 Cal. Rptr. 239].)
"LeVesque gives effect to Labor Code section 5952, which provides that: `The review by the court shall not be extended further than to determine, *910 based upon the entire record ... whether: ... (d) The order, decision, or award was not supported by substantial evidence....' (Italics added.)
"But in its review of the entire record, the reviewing court is further admonished by section 5952 that: `Nothing in this section shall permit the court ... to exercise its independent judgment on the evidence.'
"It will be seen that under LeVesque our function in workmen's compensation cases is to consider the weight or persuasiveness of all of the evidence, as contrasted with that tending to support the board's decision. For unless we do so we have not reviewed the `entire record to determine whether the board's conclusion was supported by substantial evidence.' But on the other hand, by mandate of Labor Code section 5952, we may not exercise our `independent judgment on the evidence.'" (Hulbert v. Workmen's Comp. Appeals Bd., supra, 47 Cal. App.3d at pp. 638, 639.)
"... The meaning of the term `substantial' has not been specifically defined in a workers' compensation case, but the term, as used in the substantial evidence rule applied on appellate review generally, has been defined as follows: `"Substantial evidence" is evidence which, if true, has probative force on the issues. It is more than a mere scintilla, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. ... If the word "substantial" means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' Teed Estate, 112 Cal. App.2d 638, 247 P.2d 54 (1952); see also Dyer v. Knue, 186 Cal. App.2d 348, 8 Cal. Rptr. 753 (1960); Hulbert v. W.C.A.B. [47 Cal. App.3d 634]...." (Italics added.) (1 Hanna, Cal. Law of Employee Injuries & Workmen's Compensation (2d rev. ed. 1981) § 10.08[2][a], p. 10-26, fn. 21.)
(1) Factual findings of the WCAB are thus not supported by substantial evidence in light of the entire record where such findings are in conflict with all of the evidence (Lamb v. Workmen's Comp. Appeals Bd. (1974) 11 Cal.3d 274, 281 [113 Cal. Rptr. 162, 520 P.2d 978]; Garza v. Workmen's Comp. App. Bd. (1970) 3 Cal.3d 312, 317-318 [90 Cal. Rptr. 355, 475 P.2d 451]; Sully-Miller Contracting v. Workers' *911 Comp. Appeals Bd. (1980) 107 Cal. App.3d 916, 925-926 [166 Cal. Rptr. 111]), based upon inferences which cannot be fairly drawn from the evidence (see Judson Steel Corp. v. Workers' Comp. Appeals Bd. (1978) 22 Cal.3d 658, 664 [150 Cal. Rptr. 250, 586 P.2d 564]), based upon evidence which lacks probative force (Simmons Co. v. Ind. Acc. Com. (1945) 70 Cal. App.2d 664, 670 [161 P.2d 702]), based upon a purely "fanciful conclusion" (ibid.), or based upon "the creation of nonexistent evidence [or] the creation of a conflict in the evidence which does not otherwise exist" (Sully-Miller Contracting v. Workers' Comp. Appeals Bd., supra, 107 Cal. App.3d 916, 926).
Thus, the "substantial evidence in light of the entire record" standard of judicial review is not some metaphysical concept. (2) We are not bound to accept the factual findings of the WCAB where they are illogical, unreasonable and improbable. In other words, where the WCAB's decision is not within the realm of what a reasonable trier of fact could find, the decision is not supported by substantial evidence and must be annulled. (Universal City Studios, Inc. v. Worker's Comp. Appeals Bd., supra, 99 Cal. App.3d 647.)
In finding that applicant sustained cumulative injury[1] to her psyche as the result of her employment at Volt, the worker's compensation judge relied upon applicant's testimony and the opinion of applicant's treating psychologist, Albert J. Rosenstein, Ph.D.[2]
(3) Whether applicant sustained a compensable psychiatric injury as the result of her employment at Volt requires both lay and medical evidence for support. Lay testimony must support the occurrence of injurious incidents which are employment related. Lay testimony alone, *912 however, cannot establish psychiatric injury. Expert medical evidence must support the proposition that the employment incidents are related to the development of the psychiatric condition. (See Baker v. Workmen's Comp. Appeals Bd. (1971) 18 Cal. App.3d 852 [96 Cal. Rptr. 279]; Bstandig v. Workers' Comp. Appeals Bd. (1977) 68 Cal. App.3d 988, 995-996 [137 Cal. Rptr. 713].) "`[W]here the truth is occult and can be found only by resorting to the sciences,'" the WCAB must utilize expert medical opinion. (Bstandig, supra, 68 Cal. App.3d at p. 995.) "The difficulty is that the problem was not one of lay theory, but one of diagnosis, prognosis and treatment in an occult branch of medicine." (Id., at p. 996.)
On or about September 12, 1978, applicant was hired as production coordinator by Mrs. Maxine Brumley, a Volt supervisor and applicant's sister. Applicant was discharged effective November 27, 1978, by Isadore Einstein, the manager of the print shop.
Applicant's contention of psychic injury caused by "harassment, pressures and tensions" as embraced in her application and her subjective symptoms as stated by Dr. Rosenstein's certificate of December 7, 1978, were limited to "dizziness, nausea, jumps and shakes at noises." (See fn. 4.)
However, these original complaints and symptoms were supplemented by a variety of other subjective complaints and by statements of fact and objective complaints to which she testified at her deposition and at the trial. We list them as follows: Falsely hired; falsely fired; can't maintain rapport with people; feels unable to cope; can't communicate; breaks down; headaches and depression; high blood pressure; she sweats; she belches; is filled with fear; has no confidence; does not feel comfortable in any job; very emotional and hostile; gained eighty pounds between her termination and date of trial approximately nineteen months; held one part-time job three days per week, four hours per day, which she quit because her psychic condition was such she could not put up with the departmental squabbles. Would never trust a man anymore.
The source of these complaints and the sole culprit, according to applicant, was Mr. Einstein, Volt's manager.
Applicant was first psychotherapeutically examined and treated by Dr. Rosenstein on November 29, 1978, and thereafter through March *913 29, 1979, was so treated by Dr. Rosenstein on 14 additional occasions, approximately biweekly, with a resulting billing of $1,310.[3] Applicant's deposition was taken on August 30, 1979. No formal medical report concerning applicant's condition was issued by him until November 28, 1979, three months after her deposition had been taken, one year after the alleged onset of applicant's[4] alleged psychic problems had commenced and eight months after Dr. Rosenstein had last seen applicant. This report of November 28, 1979, was transmitted to Ms. Kemp's attorneys at their request to be used at the trial which was at that time calendared for December 4, 1979.
In his report dated November 28, 1979, addressed to applicant's attorney, Dr. Rosenstein states:
"This is to advise you that your client, Myrna Kemp, was seen by me in private individual psychotherapy sessions for the period 11-29-78 up to and including 3-29-79. Her initial visit on 11-29-78 was for the purpose of a clinical evaluation which consisted of a one hour private individual clinical interview followed by the administration of a battery of psychological tests which included the Minnesota Multiphasic Personality Inventory (MMPI) and the Cornell Index, Form N2. Ms. Kemp entered the initial examination situation with some anxiety and apprehension; however, as the session progressed she seemed to relax, she put forth a good effort, and rapport was established to be adequate for a valid appraisal. She worked independently during the testing phase, not needing assurance and praise, she took approximately 2 1/2 hours to complete the tests, and I shall discuss the results with you later *914 in this report. During the four month period in which I saw Ms. Kemp in private individual psychotherapy sessions she arrived on time for her appointments, kept each and every one, was always appropriately dressed, and was cooperative.
"Myrna Kemp came to me suffering emotional trauma as the direct result of work related tensions, pressures and constant harrassment [sic] which forced her termination from employment with the Volt Technical Corporation located in El Segundo, California. At the time of her termination she was employed in the capacity of a production coordinator. This then 29 year old female presented a picture of above average intellect and had completed three years of college. She manifested some perplexity and some signs of disturbance when presented material she could not handle due to the anxiety she was suffering. She manifested some inefficiency of attention, some difficulty maintaining effective concentration. When dealing with new and unfamiliar situations she had a moderate degree of difficulty readily integrating units into meaningful whole perceptions. Her visual motor and psychomotor coordination and rate were intact. Symptomologically, Ms. Kemp exhibits nervousness and dizziness, she was observed feeling dizzy in my office, was prone to attacks of nausea, and related to me that she was so tense that sudden noises made her jump and shake.[5] It should be noted here that in taking the patient's social history it was my professional opinion that Ms. Kemp was asymptomatic prior to the termination of her employment brought on by tensions, pressures, and harrassment [sic] at work. [Italics added.]
"All devices administered to Myrna Kemp are to be considered valid as there were no inconsistencies noted in her productions. The lie, validity and test-taking attitude scales (L, F & K) on the MMPI profile were well within normal limits, and all but one of the clinical scales themselves were also below the 70th T scale, or the norm. The Cornell Index, which uses a score of 13 as the criteria for emotional stability, showed Ms. Kemp's score to be 3, which is corroborative with the *915 MMPI in denoting the fact that she was asymptomatic prior to her work related pressures, tensions and harrassment [sic], and is further corroborated by my aforementioned statement that in taking her social history I also found her to be asymptomatic.
"Based on test data in addition to four months spent in private individual psychotherapy sessions, it is my professional opinion that Myrna Kemp's diagnosis should read: APA 300.1  hysterical neurosis. This neurosis is characterized by an involuntary psychogenic loss or disorder of function. Symptoms characteristically begin and end suddenly in emotionally charged situations and are symbolic of the underlying conflicts.
"It is further my considered opinion that on 3-29-79, the last date that I saw Myrna Kemp in therapy, her prognosis was guarded in that I felt she was temporarily disabled and in need of continuing psychotherapeutic care for an indeterminate length of time.
"If I can be of further assistance please do not hesitate to call upon me."
(4) The contents of Dr. Rosenstein's report must be measured against WCAB Rules of Practice and Procedure (Cal. Admin. Code, tit. 8, ch. 4.5, subch. 2) section 10606 as in effect at the time of Dr. Rosenstein's report. Section 10606 of the WCAB Rules of Practice and Procedure (WCAB Rules) then provided:
"The Appeals Board favors the production of medical evidence in the form of written reports. These reports should include:
"(a) The date of the examination;
"(b) The history of the injury;
"(c) The patient's complaints;
"(d) Source of all facts set forth in the history and complaints;
"(e) Findings on examination;
"(f) Opinion as to the extent of disability and work limitations, if any;
*916 "(g) Cause of the disability;
"(h) Medical treatment indicated;
"(i) Opinion as to whether or not permanent disability has resulted from the injury and whether or not it is stationary. If stationary, a description of the disability with a complete evaluation; and
"(j) The reason for opinions." (Italics added.)
The necessity for the WCAB to require medical reports comply with WCAB Rules section 10606 is quite apparent.[6]
The WCAB is specifically permitted to receive into evidence the medical reports of "attending or examining physicians." (Lab. Code, § 5703.) Utilization of written medical reports allows for the expeditious handling of cases by eliminating time consuming and often unnecessary oral medical testimony. Further, the written report provides the physician with the opportunity to provide a well-reasoned, orderly presentation of facts, findings, and opinion. (1 Hanna, Cal. Law of Employee Injuries & Workmen's Compensation, supra, § 12.03[6].)
*917 While it is true that the "relevant and considered opinion of one physician, though inconsistent with other medical opinions, may constitute substantial evidence" (Market Basket v. Workers' Comp. Appeals Bd. (1978) 86 Cal. App.3d 137, 144 [149 Cal. Rptr. 872]), section 10606 recognizes that not all medical reports may be relied upon by the WCAB. "[N]ot all medical opinion constitutes substantial evidence upon which the board may rest its decision. Medical reports and opinions are not substantial evidence if they are known to be erroneous, or if they are based on facts no longer germane, or inadequate medical histories and examinations, or on incorrect legal theories. Medical opinion also fails to support the Board's findings if it is based on surmise, speculation, conjecture, or guess." (Hegglin v. Workmen's Comp. App. Bd. (1971) 4 Cal.3d 162, 169 [93 Cal. Rptr. 15, 480 P.2d 967].) Further, as "A report which offers a [mere] conclusion as to whether or not the case is `compensable' intrudes upon a matter which is not a medical question, but one for ultimate determination by [a workers' compensation judge] and Appeals Board" (1 Hanna, op. cit. supra, § 12.03[6], p. 12-30.2, fn. 34), such a conclusionary report also does not support a decision awarding or denying benefits.
Unless a medical report complies with section 10606 of the WCAB Rules neither the workers' compensation judge, the WCAB, nor this court on review can make a rational decision on whether such report constitutes the kind of evidence on which a reasoned decision can be based.
Measured against section 10606 of the WCAB Rules, Dr. Rosenstein's report of November 28, 1979, is woefully inadequate. Dr. Rosenstein's history of the alleged injury is contained entirely in the statement that applicant was "suffering emotional trauma as the direct result of work related tensions, pressures and constant harassment which forced her termination from employment with Volt Technical Corporation."
Dr. Rosenstein in his report sheds no light on the nature of "harassment, pressures and tensions" nor does he suggest what occurred or what applicant stated or complained of in the four months applicant was under his care. Certainly applicant could testify, as she did in her deposition and at the trial, as to alleged harassment, etc., but there is no way of knowing whether such testimony was substantially the same as was related to Dr. Rosenstein on November 29, 1978, when he first tested or treated Ms. Kemp or during the four months of periodic *918 treatment, or whether what she testified to was even known to Dr. Rosenstein.
Applicant, in the words of her psychologist, was of "above average intellect." She was "asymptomatic" prior to her employment. She had completed primary and secondary schooling and for approximately three years attended Pepperdine University at its Vermont Avenue campus, majoring in psychology. Ms. Kemp's job history (discussed infra) was not set out by the doctor. She had been variously employed prior to her employment at Volt, with disappointing results but the record shows that prior to the Volt termination, she had enjoyed good health, had not had headaches or suffered from high blood pressure or suffered any traumatic psychic disturbance or trauma.
However, aside from noncompliance with WCAB rules, the report impeaches itself. The doctor admits he had last seen Ms. Kemp on March 29, 1979, a period of eight months prior to the date of his report and he was not to see her again until May 28, 1980. The report does not explain the difference between the prognosis made in the certificate which he filed on December 7, 1978 (see fn. 4), and the prognosis made in the November report; it indicates no knowledge of Ms. Kemp's deposition taken on August 30, 1979, or of any of the testimony in that deposition; of her prior job history as testified to in the deposition; it does not refer to a letter dated April 13, 1979, of Victor Scholz, M.D., who certified that she was on that date or would be able to resume work no later than July 1, 1979; it does not explain why the visits of Ms. Kemp stopped on March 29, 1979. The November report omits reference to the testimony of Ms. Kemp given at the trial held on June 9 to the effect that she took a part-time job with the city library because of Dr. Rosenstein's advice to try something different. Such advice if given by Dr. Rosenstein was of necessity given some time prior to March 29, 1979, as the record shows Dr. Rosenstein did not see or treat Ms. Kemp again until May 28, 1980, and Ms. Kemp took the part-time job sometime in or around November 1979, the month the report of that date was written and abandoned it four weeks later.
It was the only job applicant had held since her termination. She testified at the trial in pertinent part with respect thereto as follows: "Well, I entered the job and I seemed to like it at first, and then they had their interdepartmental squabbles, and I tried to mesh to it. I asked questions, whatever. I told them that I was a responsible worker and had been through the years. However, with my previous job, that I *919 come into so many personal problems, that I wasn't able to maintain my work status there, or to remain with them."
Speaking further of the Library job, at her deposition she testified in part:
"A. I wasn't able to continue with the job because I couldn't get along with the job as represented itself. It wasn't my field, but I tried to find something different.
"Q. Have you been able to find any other work?
"A. No, I haven't.
". . . . . . . . . . . . . . .
"Q. Besides the departmental squabbles, what other problems did you find at the library that made it difficult for you to work there?
"A. It wasn't my type of work. I tried to get something different.
"Q. What was the problem with it in terms of not being your type of work?
"A. I have been in the field of printing for over eight years now. I tried something different. My doctor, Rosenstein, suggested that I try something and I did. It didn't work out for me." (Italics added.)
The deposition indicates a job record approximately as follows. Prior to leaving David Levy for employment by Volt, Ms. Kemp had worked for Pacific Tag and Printing where she worked for approximately one year. She left that job because of interoffice management changes. She was asked, "Did you resign or were you asked to leave? A. I was asked to give up my services."
Before that she worked for Crestline Thermographers for approximately a year.
"Q. What was your reason for leaving Crestline?
"A. There was no room for promotion at that shop."
*920 Prior to Crestline she worked for Handling Services in Hawthorne for approximately one and a half years and left because the company closed. Next she worked for Printco Coop Printing from sometime in 1973.
"Q. What was your reason for leaving?
"A. I quit because no room for progress."
Before that she worked for Security Pacific as a note teller from 1968-1971.
"Q. Approximately when did you begin working for Security Pacific?
"A. I worked for Security Pacific from 1968 to approximately 1971.
"Q. Did you have any employment between Security Pacific and Printco?
"A. I was in school just part-time employment with banks."
There is no record of work before joining Printco Coop in 1973 except the part-time work with banks and such time as she went to school.
Ms. Kemp also testified in her deposition that between the date of her termination at Volt, she saw two other M.D.s, family doctors, who treated her for headaches and high blood pressure. Neither of those doctors filed a bill; neither of them made reports; neither of them were employed with any knowledge of her employer; neither of them testified. In brief, the November report of Dr. Rosenstein relies on the complaints which he listed in his certificate of December 7, 1978 (see fn. 5 and which we emphasized in the November report set out in full above).
A proper and logical inference from the factual chronology of the record is that Dr. Rosenstein consistent with his original prognosis discharged Ms. Kemp on March 29, 1979, and told her he could not help her or he told her to find other work (as she testified) or she abandoned the doctor and did not see him after March 29, 1979, until May 28, 1980, when she returned for I.T. as his bill shows or for other purpose.
*921 On June 3, 1980, Ms. Kemp was examined by John Paul Walters, M.D., a psychiatrist.
Thereafter, Dr. Rosenstein issued another report dated June 4, 1980.
The June report is replete with the narration of subjective reactions and complaints but states one objective act of harassment, she was humiliated to find out she could be fired "at the drop of a hat."[7] The specifics of other acts of harassment are not presented by Dr. Rosenstein. Rather than making a clear statement of the psychodynamics of applicant's condition, Dr. Rosenstein fails to explain how a previously "normal" person such as applicant (at least according to Dr. Rosenstein) is purported to have been so adversely affected by the alleged job "harassment, etc."
After March 29, 1979, Dr. Rosenstein saw applicant for two therapy sessions, one on May 28, 1980, and the second on June 4, 1980, the date of his final report. Coincidentally, applicant was evaluated on behalf of INA by John Paul Walters, M.D., a psychiatrist, on June 3, 1980.
The June report states: "Please refer to a report I wrote re: your client, Myrna Kemp, and addressed to Jack Goodchild, Attorney at Law, on November 28, 1979, regarding background information.
"This 29 year old Black female returned to my office on 5-28-80 for re-evaluation and again today, 6-4-80. Ms. Kemp continues to suffer *922 emotionally from the mental aggravation and harrassment [sic] that took place while she was in the employ of the Volt Technical Corporation in 1978. Depression, hostility and anger has disarranged her whole mental and physical feelings about herself. She has always felt a sense of ethics and morality and was totally destroyed when she found out that she was falsely hired and fired by the Volt Corporation after she had quit a good job being told that the one with Volt was even better. After being praised for the excellent job she was doing she was humiliated to find out that she could be fired at the `drop of a hat' which she was on 10-9-78 [sic]. She feels she was `used' and directs her anger and resentment toward one Ike Enistein [sic], her supervisor who was responsible. On the surface Ms. Kemp is quite calm and cannot release her anger. She doesn't trust anybody, doesn't like that trait within herself, and has a low self image. She is bitter, feels that she was naive in the situation, guards against the possibility of being naive and taken in again, feels abused, and wants to give up.
"Myrna Kemp is single, is one of five children in a family were [sic] both her mother and her father are still alive. She is of above average general intelligence and completed 2 1/2 years of college. She smokes and says that how much depends on her nervousness  10 an hour or 10 a day! She drinks alcoholic beverages in moderation, maybe only twice a month.
"Based on two current sessions with Myrna Kemp, psychotherapy sessions, that is, it is my professional opinion that the diagnosis stated in my previous report, i.e. APA 300.1  hysterical neurosis, remains her diagnosis at this point in time. This is an inwardly volatile woman and should definitely continue with psychotherapy on an on-going basis in order to release the tensions, anger, hostility, resentment, bitterness, hysteria, depression and anxiety that is pent up inside of her.
"If I can be of any further assistance please do not hesitate to call upon me."
We do not question the right of Dr. Rosenstein to a copy of Dr. Walters' report and we do not know whether he was familiar with its content but we do note the opening sentence of Dr. Walters' report (infra) starts with: "Myrna Kemp a 31 year old black female...." In his June report, Dr. Rosenstein, in his opening sentence starts with, "This 29 year old Black female returned to my office on 5/28/80 for...." Nothing in Dr. Rosenstein's certificate filed on December 7, 1978, or in *923 his November report or in any of the documents in the file identifies applicant as a black female.
Dr. Walters' office is in Tarzana, California. Dr. Rosenstein's office is in Encino, California. Attorneys for applicant's office is in Sherman Oaks, California, and the hearing was held in the WCAB office in Panorama City, California. Thus the primary witnesses other than applicant herself were within a radius of a few miles of the WCAB office where Dr. Walters' report would be filed.
We know that Dr. Walters saw Dr. Rosenstein's November report and had a copy of the deposition. He mentions these facts in his report (infra).
For the first time Dr. Rosenstein mentions a number of the complaints and statements not mentioned in his certificate of December 7, 1978, or his report of November 28, 1979, which were heretofore summarized, and for the first time, he elaborates upon what the evidence shows to be the prime alleged source of applicant's discontent, to wit, her statement that she was falsely hired and fired; or could be fired at the drop of a hat; she is bitter, and naive, and cannot release her anger and resentment toward Mr. Einstein. The difficulty we encounter is that he purports to say he knew about all of the complaints, objective and subjective, and all of her charges from the time of his original interview. He prefaces his outline of her mental state with the sentence: "Ms. Kemp continues to suffer emotionally from the mental aggravation and harassment that took place while she was in the employ of ... Volt...." However, the only acts of harassment cited resulting in the emotional upset of Ms. Kemp were "she was falsely hired and fired" after being praised...." She was humiliated to find out she could be fired at the "drop of a hat."
Mere reading of the June report immediately springboards a variety of questions. Why were the conclusions or some of them and applicant's statements or some of them not included in her application or statement of claim? Why not in the psychologist's certificate of December 7, 1978? Why were not all of them included in the November report? Did Dr. Rosenstein require two more visits, that of May 28, 1980 and that of June 4, 1980, to make the completely new observation and conclusions he does not mention in his certificate or November report? He had been content to rest on the November report without any immediately prior visits. If he needed only two visits to elaborate on the *924 November report even though she was not present when he wrote it and hadn't seen her for approximately eight months, why could he not have embraced some of those complaints and statements in his certificate of December 7? Prior to December 7, he had had two I.T. visits with Ms. Kemp concurrent almost to the day of the grave psychic injury she had allegedly suffered. He administered a complete test to her at a cost of $350 and in addition, had her in his presence for individual therapy. Based on the doctor's bill, the total time spent for the first two visits was substantially more than the last two. It is clear from the record that when on November 29, 1978, Ms. Kemp saw the psychologist, she was so wrought up about a psychic injury so severe as to impel her to employ a psychologist, and hire counsel forthwith and almost concurrently file her application that she was suffering from all the subjective trauma she complains about, all of which it appears must have been discussed with her psychologist and her counsel. We must assume that Dr. Rosenstein knew she could not pay. He filed a lien for payment. He did not advise her employer. He knew she had had one. Yet he expended $410 of his time and concluded arrangements for periodic clinical visits which continued to March 29, 1979. However, if we assume Dr. Rosenstein was fully apprised of Ms. Kemp's psychic injury as outlined in his June report, we must also assume he made an intelligent forecast when he said she would be ready to work within six months.
The burden of proving work connected injury is on applicant. We are satisfied that burden has not been met and no further discussion is required to annul the award. However, we feel impelled to make further analysis of this record.
Before we leave our analysis of the medical evidence, we feel obliged to advert to the report of John Paul Walters, M.D., a psychiatrist, who examined Ms. Kemp on behalf of petitioner, introduced as defendant's A. The discussion of exhibit A necessarily includes a discussion and analysis of the judge's report to the board recommending to the board that it deny petitioner's request for reconsideration of the findings and the judge's treatment of Dr. Walter's report. This report complies substantially with Workers' Compensation Appeals Board rule section 10606. The judge however, ignored it except for a reference to two paragraphs of conclusions which follow its many pages of exhaustive analysis of applicant's subjective and objective symptoms.
Thereafter, the judge stated as heretofore mentioned, that based on the November and June reports of Dr. Rosenstein and his observation of *925 applicant he recommends denial and ends with his opinion that Ms. Kemp desperately needed continual psychiatric treatment. No medical or psychological report stated or suggested desperate need. The judge made no specific statement or analysis of any bit of evidence which had led him to that conclusion. He completely omits comment on any of the facts mentioned in the letter of Dr. Scholz. The judge also noted petitioner had requested but much too late in his opinion, the appointment by the court of an independent medical examiner and therefore advised against it.[8]
Finally, he did not call the report of Victor Scholz, M.D. to the Employment Development Department to the board's attention nor did he advise the board that Victor Scholz, M.D. did not agree with his findings or with the conclusions in the November or June reports of Dr. Rosenstein. Nor did the judge point out that on the facts related to Dr. Scholz, and not on those set forth in the December 7 certificate of Dr. Rosenstein which were a part of the record, did Dr. Scholz make a diagnosis or evaluation of "Hysterical neurosis" but did so on facts related to him when he examined her on April 13, 1979, and who did as of that date in effect state Ms. Kemp "was able to return to work or will be able to return ... on July 1, 1979."[9]
*926 In brief, there is no M.D.'s opinion evidence which remotely supports the opinion of the psychologist and Dr. Walters' report rejects it en toto.
We close our analysis of the medical evidence with the report of Dr. Walters:
"Myrna Kemp, a 31 year old black female, about 5'8" tall and weighing approximately 175 pounds[[10]] was seen for psychiatric consultation, this date, June 3, 1980. She smoked during the psychiatric evaluation. She also indicated that she weighed about 140 pounds two years ago. For the past few years she has worn glasses. Initially she was somewhat guarded and hesitant but then established good rapport and was quite outspoken concerning her termination from Volt Technical Corporation. She did not appear hostile or antagonistic about the referral for psychiatric consultation. This woman had previously been scheduled for a psychiatric evaluation with this examiner on April 28, 1980. She did not arrive for her scheduled appointment and did not either notify this office either to confirm or cancel the appointment. Now she states that when she received the notice of the appointment she decided that she could not afford any therapy and for that reason avoided the psychiatric consultation.
"Myrna Kemp is single, has never been married, and has no children. Presently she shares the rent at the home where she is living on South Dalton Avenue. She is not working at the present time. During 1978 she worked part time for four weeks in a public library and says `the job was not for me. I was not used to the structure.' She is currently receiving disability benefits in the amount of about $400.00 monthly.
*927 "She was employed at Volt Technical Corporation from September 12, 1978 to November 1978. She was then terminated from her position as a production coordinator. She says `I was fired from my job.' Her supervisor who had hired her had previously resigned from her job and she feels that the plant shop manager terminated her because she was hired by the woman supervisor. However, he also told her that he lost profits on a job which she coordinated. She feels that this was not correct, that she had had the permission from the night shift supervisor and that she used a photo process rather than an electrostatic camera because the camera was not `set up to do 11 x 17's'. She was sent to a clerical position through the unemployment office and indicates that she received a `bad reference' from Volt Technical Corporation. After she was terminated she received State Disability, then unemployment benefits, and now again State Disability. She does not know when she will return to work or if she will return to work in the graphic arts because `it is a totally male oriented field.' However she indicates that she enjoyed working with customers and the production workers and found graphic art and lithography to be a creative experience.
"Myrna Kemp was born May 26, 1949 in Los Angeles and was principally raised in the Inglewood area. She graduated from Washington High School in 1967 and has taken some college courses at the Vermont Campus at Pepperdine University. She feels that she has enough credit to be somewhere between a sophmore and junior. She was a psychology major. Her father, now 60, is a retired diatetic supervisor from the VA Hospital at Sawtelle. He entered there after he left the Navy and worked for many years. Her mother, now in her 50's is a bilingual elementary teacher in the Los Angeles Unified School System. She is one of five siblings. A sister, 33, widowed with five children is employed as a clerk in the post office. Another sister, 32, divorced with three children is working in the graphic arts field. A younger brother, 27, married, childless, works for United Parcel Service. Another brother, 25, single, is a freelance artist and maintains himself economically.
"After graduation from high school she worked as a part time clerk for Credit Data Corporation and then was financial note teller at Security Pacific Bank from 1968 through 1971. Following this she did odd jobs while she attended school and was in Hawaii during 1973 for six months to one year but could not find employment. She then returned to the Los Angeles area and found employment with Printco. She states that she left Printco because there were too many family members employed and there was no chance for advancement. She then worked for *928 handling services for a short period of time and then Crestline Thermographers. She left that job because she wanted to be an assistant in production but was mainly helping the accountant. Following this she worked for Pacific Tag and Printing Company and indicates that there were internal problems with that company and she was `laid off.' Then she worked at David Levy Lithograph for about nine months and describes this as a high volume color specialty shop. She was doing well at David Levy Lithography but moved on to Volt Technical Corporation because she was offered more pay and because she thought it would be a `growth experience.'
"After she went to Volt Technical Corporation she indicates that it was `not the job I expected.' She discovered that her work was criticized and she resented the fact that she was not given enough overtime. She states `I quit a good job and I left to better myself.' However at Volt Technical Corporation she did not feel that she was bettering herself. She had no problems with her co-workers and indicates that the only one that gave her any difficulty was the shop foreman. She states quite emphatically that although she was not completely satisfied with the job at Volt Technical Corporation she never would have left employment voluntarily.
"She indicates that she feels the job was represented to her falsely. In retrospect she feels that she was only invited to work at Volt Technical Corporation so that they could make more profit. She found it to be a disorganized place and in retrospect felt that she had lost valuable experience by not working at David Levy Lithographers.
"This woman admits that she was extremely angry when she was terminated. She then felt that she was `used' and I gave them my best effort.' She felt that her employer could not prove that she was incorrect in anything that she did.
"This woman's deposition taken on August 30, 1979 has been reviewed. In the deposition she states that she was disillusioned after she went to Volt Technical Corporation. In her deposition she is extremely vague about how she was harassed. She was apparently discharged after the Thanksgiving Holiday. She indicates that she did not feel that she was treated wrongly by anyone at Volt Technical Corporation except Mr. Eisenstein. She does admit at the time of the deposition that there were minor errors in various work and she relates this to poor quality control. She is vague about the minor errors. There is some question *929 about any harassment done by Mr. Eisenstein. She did state at the time of the psychiatric consultation as she did at the time of the deposition that Mr. Eisenstein tended to speak through a third person and that she had some difficulty dealing with him directly because he wanted her to deal through her immediate supervisor. She did indicate at the time of the deposition also that she resented not getting overtime.
"At the time of the deposition she complained of some headache. Now, she indicates that it was really `dizzy spells' and after the deposition she consulted Dr. Pilate and was told that she had some hypertension. He prescribed Phenobarbital.
"The record indicates that on November 29, 1978 two days after she was terminated she first consulted Albert J. Rosenstein, PH.D., a clinical psychologist in Encino. Now, she states that a friend told her that she should see a psychologist or a psychiatrist because she was so angry about her termination. Dr. Rosenstein wrote a report dated November 28, 1979. He indicates that he saw her from November of 1978 to March 29, 1979. During this four month period he saw her on a weekly basis. He felt that she was above average in intelligence and was somewhat anxious. Dr. Rosenstein felt that she was asymptomatic prior to her termination. However, he indicates that the termination was precipitated by `tensions, pressures, and harassment at work.' There is in the report nothing to indicate any specific harassment. He felt that she had an hysterical neurosis and that she was in need of continuing psychological counseling. Now, she indicates that she has seen Dr. Rosenstein a few times during the past few weeks.
"She does not know what she is going to do in the future because now `I am not secure in the field' (meaning graphic art). She has attended a few classes at Southwest Junior College to be an interpreter for the deaf. She does not know whether she will return to the graphic arts because she does not know whether it is worth while fighting for a position in what she considers to be a male dominated work field. She definitely conveys the impression at the present time that she is under no internal desire to return to gainful employment.
"Mental status examination at the present time reveals a healthy appearing young woman in no acute or chronic physical distress. She has no present complaints of dizziness or headache. There was no evidence of tremor, anxiety, apprehension, tension, or depression. There was no belching observable as there was at the time of the deposition. She was *930 neatly dressed, showed no deterioration in her personal habits, and no peculiarities of dress or mannerisms.
"There is nothing eccentric or bizarre about this woman's appearance or behavior. Her thinking is logical, rational, and goal directed. Her speech was clear, concise, relevant and pertinent. She would appear to be of average intelligence and there is no impairment in comprehension, concentration, or intellectual acuity. There is no cognitive disability.
"There is no doubt that this woman is angry about her termination from Volt Technical Corporation. She indicates that before she worked at Volt Technical Corporation `I got along well with top management people and many of them millionaires.' Basically, she states that she does not know why she was terminated but feels that any termination was unjustified. She had no intention while she worked at Volt Technical Corporation of leaving her position as a production coordinator because of any work related activities or any interpersonal relationships within the company. She denies any suicidal ruminations past or present. Her mood was entirely appropriate during a lengthy psychiatric evaluation. Presently there is no evidence of any acute or chronic organic brain syndrome. Memory both recent and remote is adequate. She is oriented and attention, retention, and immediate recall are within normal limits. Her fund of general knowledge is adequate as is her knowledge of current events. Her judgment is not impaired.
"At the present time this woman shows no evidence of psychopathology which would warrant any psychiatric diagnosis. There is no evidence at the present time of any psychiatric disability resulting from her brief period of employment at Volt Technical Corporation. She is vague and noncommittal as to why she has gone back to see Dr. Rosenstein. She is also rather vague as to why she consulted Dr. Rosenstein for a period of four months immediately after she was terminated from her employment at Volt Technical Corporation.
"Overall, this woman was very willing to talk about her work at Volt Technical Corporation and her previous jobs but she was very guarded and suspicious about any aspect of her personal life, her present living situation, or her present daily activities.
"In my opinion, at no time was this woman temporarily disabled because of psychiatric impairment. She clearly states that she was angry about her termination, that she felt that she was doing a good job, that *931 she was satisfied with her position, and that she feels that her termination was unjustified. Two days after she was terminated she consulted Dr. Rosenstein and apparently on this basis established some sort of disability status.
"In my opinion this woman's overall mental status at the present time can be considered permanent and stationary in that she is reacting in her usual and habitual manner to life events, her environment and her own internal needs. She presents herself as a striving woman who may in some ways over-estimate her capabilities. She definitely tends to present herself with a great deal of justification and tends to blame others for injustices because she is a woman and because she is black.
"In my opinion this woman has no mental or emotional impairment which would keep her from being gainfully employed at the present time in any occupation that she was motivated to do. She has successfully completed courses at Southwest College indicating that there is no `inefficiency of attention' or `some difficulty maintaining effective concentration' as mentioned by Dr. Rosenstein in his report of November 28, 1979."
We conclude with a brief presentation of pertinent testimony of Ms. Kemp which affirms the admissions made in her application and statement of claim and demonstrates that the "harassment, pressures and tensions" of which she complains are all embraced in and germinated concurrently with the fact of her discharge from Volt. Ms. Kemp was hired for and positioned in a job she wanted to keep by her sister, Mrs. Brumley, a trusted supervisor acting for Volt.[11]
*932 The testimony, both in her deposition and at the trial, shows no complaint by Ms. Kemp about her physical or psychic being at any time prior to discharge other than she was not allotted overtime. Thus, she testified:
"Q. If you had not been fired, were you planning to continue working at Volt Technical?
"A. Exactly, yes. That is what I told him.
"Q. Is it your testimony that all of your problems that you have described are due to being fired at Volt Technical?
"A. I  yes. I was fired on the spot [see fn. 7, ante] after being told that I was welcome at the company. And when I look back on it, I was falsely hired."
Within the framework of the above excerpts which mark the beginning and the end of her tenure at Volt, applicant experienced periodic difficulties on her job. She made mistakes but she insisted they were minor or inconsequential, or they did not cause the loss of money. She felt she was unfairly treated in allotment of overtime; she resented not having direct communication with Einstein, the manager; she was humiliated because on termination her check was delivered to her in the presence of other employees.
Ms. Kemp discusses two of such mistakes in her deposition. The first occurred soon after a two-week training period. She testified:
"After a meeting, an office meeting, around October found that our work was pretty good except for some minor error in which none were relative to profit loss. Mrs. Einsenstein pulled me to the side and asked me about a job that had already been discussed, seemed to reiterate it for no reason at all and harassed me behind it. I told him that ... the error was made corrected and I am glad that there was no profit loss on it.
*933 "He then called a meeting which I found out with his assistant, Mrs. Brumley, who was my immediate supervisor and asked her to speak to me." (See fn. 7 ante.)
The second of the mistakes made she elected to testify to was discussed with Mr. Einstein immediately after the Thanksgiving holiday at the time of her discharge:
"I returned to work after the holiday promptly. He asked me if I would come into his office. I came into his office.
"He told me that he was letting me go. I asked him `Why? Show me a reason. I am coming in from work. I am expecting my job.'[[12]]...
*934 "I then asked him what was the reason. He stumbled through job contracts, this Pacific one that I work with well. I worked with Pacific Telephone on at least three prior jobs before I worked with that company. I was well aware of their type of contracts.
"He pulled a Pacific Telephone contract and said that I made him lose a profit on it. I proved him incorrectly because of shop procedure which is followed and which Pacific Telephone's grade printing job is A or B, metal or foil, and upon confirmation of this with the photo department who has to do their work for high grade work, Ike Eisenstein found that he was incorrect. He walked out and went to his office.
"After I found and was secure with myself that I didn't make an error, I went back to his office, asked him was he true, was that his decision to be made.
". . . . . . . . . . . . . . . . . .
Q. Do you recall exactly what he said to you in terminating you?
"A. Yes. He said, `Myrna, I have this Pacific Telephone job.' He looked for it for about five minutes and he said, `I am letting you go because you made me lose some money on this job.'
"I said, `Prove it,' and he didn't prove it so I felt like he was lying. I said, `Fine.' I was terminated. I went to my desk. I went to clean up my desk. I went to leave the office.
"He says, `Myrna, I have something for you.' I returned to his office. I asked him if this was his true reason and not because one of his other employees had terminated  had resigned on him and he was blaming me or taking it out on me because of this resignation from his assistant and he did not reply.
"He simply gave me my check in which it was dated during the holiday, approximately the day after he asked me would I continue with his company. That day prior to that time since I was influenced by them *935 by two top representatives of their company of the printing department to leave a perfectly good job with promotional aspects and went to the, I was treated very wrongly as to this day.[[13]]
"MR. ANSON: Okay. You have answered his question.
"Q. By MR. McKENZIE: Do you feel that you were treated wrongly by anyone besides Mr. Eisenstein?
"A. No."
With respect to the circumstances of her termination, in addition to the conversations to the Pacific job excerpted above, Ms. Kemp deposed:
"A. Yes. I was very disappointed the week of my termination when he made like my services were well warranted there and asked me would I remain with the company even though they had other interdepartment squabbles. I was very proud to say that I would be with the company, and he then turned around and presented me with a check in front of those same co-workers upon my return to work.
"Q. Were you terminated in front of your co-workers; is that what you are saying?
"A. Yes, I was.
"Q. Which co-workers were those?
"A. Michael Ballantine, Steve Chapman, their night shop supervisor, Beau.
"Q. Pardon me?
"A. Beau, B-e-a-u. Photo department was in on the discussion also.
". . . . . . . . . . . . . . .
*936 "Q. When you were terminated though, the conversation was only between you and Mr. Eisenstein?
"A. No. It was not. It was out of the office for maybe anybody to hear.
"Q. You were the only participant in the conversation, though; is that correct? Did anyone else speak in the conversation?
"A. Yes, he did and someone else's opinion. He did ask for photograph's opinion of the job order. Yes, he did. Others were included.
"Q. After he got the positive response from the photography supervisor, what did he do then?
"A. What did he do?
"Q. Yes.
"A. He walked out to his office as if I were not there, and I had to follow him back to see what his response was from there.
"Q. He had already terminated you; is that correct?
"A. Yes. I had already been terminated."
With respect to overtime, Ms. Kemp in answer to "anything else which you regarded as harassment at Volt?," testified:
"A. Yes.
"Q. Please describe that.
"A. Between my co-worker and I there was no harassment. However, through Ike Eisenstin, my co-worker received more overtime that I did upon request and there was at least 10 hours overtime a week.
"Q. What was your co-worker's name?
"A. Michael Ballantine.
*937 "Q. And you feel that because he received overtime and you did not that that was harassment directed to you; is that correct?
"A. That was directed at me following some of the prior incidents that were also directed at me, yes. I was not allowed the privilege of as much overtime as he.
"Q. Did you complain to your supervisor about this?
"A. Yes.
"Q. What did your supervisor tell you?
"A. That I authorized all overtime  that Mr. Eisenstein authorized all overtime.
"Q. Did you complain to Mr. Eisenstein about your overtime situation?
"A. Yes. I was ignored.
"Q. What did you say to him?
"A. I would like either early afternoon or late overtime.
"Q. What did he say in response?
"A. `We will see.'"
Neither medical nor lay evidence of any probative value supports the findings of industrial injury. Thus Labor Code section 5814 does not authorize a 10 percent penalty and no such penalty is warranted. (Kerley v. Workmen's Comp. App. Bd. (1971) 4 Cal.3d 223, 227 [93 Cal. Rptr. 192, 481 P.2d 200].)
In sum it appears no valid medical evidence shows psychic injury. There is no probative or tenable lay evidence showing applicant suffered a psychic or any injury which was work connected.
And finally although all of her testimony with respect to alleged harassment is when analyzed self-refuting, we note that none of her testimony including that with respect to subjective complaints is corroborated *938 by her sister, any of her coworkers with whom she by her own admission got along well, or any witness.
The order of the board denying reconsideration and the findings of the trial judge are annulled and the matter remanded to the WCAB.
Compton, J., and Beach, J., concurred.
NOTES
[1] "An injury may be either: (a) `specific,' occurring as the result of one incident or exposure which causes disability or need for medical treatment; or (b) `cumulative,' occurring as repetitive mentally or physically traumatic activities extending over a period of time, the combined effect of which causes any disability or need for medical treatment...." (Lab. Code, § 3208.1.)
[2] "(a) `Physician' includes physicians and surgeons, psychologists, ... licensed by California state law and within the scope of their practice as defined by California state law. [¶] (b) `Psychologist' means a licensed psychologist with a doctorate degree in psychology and who either has at least two years clinical experience in a recognized health setting, or has met the standards of the National Register of the Health Service Providers in Psychology. [¶] (c) When treatment or evaluation for an injury is provided by a psychologist, provision shall be made for appropriate medical collaboration when requested by the employer or the insurer." (Italics added.) (Lab. Code, § 3209.3.)

Dr. Rosenstein did not treat or evaluate applicant in conjunction with a psychiatrist; neither INA nor Volt requested that Dr. Rosenstein do so.
[3] Inexplicably Dr. Rosenstein's treatment records are not part of the appeals board's record.
[4] Dr. Rosenstein did on December 7, 1978, sign a "Doctor's Certificate" to assist applicant in her claim for unemployment disability from the State Employment Development Department. The diagnosis given is "Hysterical Neurosis"; the "history" is stated as "dizziness, nausea, jumps and shakes at noises." This form neither details the basis of Dr. Rosenstein's diagnosis nor gives any detailed background for the alleged injury. Dr. Rosenstein gives an estimated return to work date of June 1979. In response to the form's inquiry on whether the disability was "the result of `occupation' either as an `industrial accident' or as an `occupational disease'?", Dr. Rosenstein checked the box marked "yes." Again, no elaboration of the basis for such opinion is offered by Dr. Rosenstein in connection with this form. Applicant's form as part of the claim for unemployment disability benefits is equally uninformative. Applicant indicates she stopped working because she was "terminated" and that her disability was caused by work "harassment, mental pressures & tensions."

As will be noted infra this minimal information hardly justifies an award of workers' compensation benefits.
[5] We note at this point that Dr. Rosenstein in the above emphasized lines of his November report makes reference to only the same subjective symptoms he described in his certificate filed on December 7, 1978. He was not told, did not know, or discounted all of the other subjective and/or objective symptoms and complaints heretofore listed and concludes his diagnosis with "My ... opinion [they were] brought on by tensions, etc.... at work." Nor does the doctor say he "observed" her "feeling dizzy," or that he tested her to determine whether she jumped and shook at "sudden noises." The only change in the November report and the December 7 certificate is the doctor's prognosis. Both of Dr. Rosenstein's reports are more fully discussed in the text.
[6] Effective July 1, 1981, the WCAB amended section 10606 of the WCAB Rules. We have emphasized a portion of the new rule which is of interest to the present matter even though the new rule has no technical application herein. New section 10606 of the WCAB Rules provides:

"Physicians' Reports as Evidence. The Workers' Compensation Appeals Board favors the production of medical evidence in the form of written reports. Direct examination of a medical witness will not be received at a hearing except upon a showing of good cause and written notice to the parties filed and served at least 20 days before the hearing.
"These reports should include where applicable:
"(a) the date of the examination;
"(b) the history of the injury;
"(c) the patient's complaints;
"(d) source of all facts set forth in the history of complaints;
"(e) findings on examination;
"(f) opinion as to the extent of disability and work limitations, if any;
"(g) cause of the disability;
"(h) medical treatment indicated.
"If any person other than the physician who has signed the report has participated in the examination of the injured employee or in the preparation of the report, the name or names of such persons and their role shall be set forth, including the name of person or persons who have taken the history, have performed the physical examination, have drafted, composed or edited the report in whole or in part.
"In death cases, the reports of non-examining physicians may be admitted into evidence in lieu of oral testimony.
"Failure to comply with the requirements of this section will not make the report inadmissible but will be considered in weighing such evidence." (Italics added.)
[7] The record shows that applicant and her sister were discussing a mistake made by applicant and called to the attention of her supervisor. In pertinent part, the conversation between the sisters was as follows:

"I spoke to her. She noted that it was a minor error and I agreed with her, told her that I have spoken to Ike about it and wondered why she called me in. She then informed me that it was against her wishes at that time in early October and that he wanted to fire me upon my next mistake. I told her at that point that if he thinks he is telling me that he can fire me at the drop of a hat and on such a minor thing, she was telling me that she told him that it was of no necessity and that we needed such a good worker. ..." Later in the deposition she explained:
"Q. Did he actually tell you that he would terminate you at the drop of a hat?
"A. He told my supervisor to tell me.
"Q. In other words, she told you that he would fire you at the drop of a hat?
"A. That is right."
The excerpt immediately above shows that the only person who used the expression "fire me at the drop of a hat" was Ms. Kemp.
It should also be noted Ms. Kemp was not terminated until late in November (discussed infra).
[8] The judge's negative recommendation for a court-appointed expert impels the exposition of a curious bit of colloquy at the trial between the judge and Ms. Kemp:

"THE COURT: Have you been treated by Dr. Rosenstein?
"THE WITNESS: I have been treated by Dr. Rosenstein
"THE COURT: Has his treatment helped you?
"THE WITNESS: He has been working with me. I have been a management problem, he says. He has been of some help to me, however, I have not released my hostilities from this incident.
"THE COURT: Would you like to continue treatment by him?
"THE WITNESS: I would like to continue treatment by Dr. Rosenstein...."
Aside from the propriety of a judge recommending a personal M.D., or doctor of psychology to a party in litigation before him and on the assumption Ms. Kemp needed psychiatric treatment, it would appear from the record that as Dr. Rosenstein had not treated nor seen Ms. Kemp from March 29, 1979, except for two visits on May 28, 1980 and June 3, 1980, and in view of the many questions raised and unanswered as to why her clinical visits to Dr. Rosenstein had ceased and her answer to the judge's question, "... I have been a management problem," he says "... and the fact that Dr. Rosenstein does not state in any of his reports Ms. Kemp `has a management problem,'" plus the evidence noted by the judge during the course of the trial that Ms. Kemp had gained 80 pounds since her termination at Volt, and the marked division of opinion in all the medical reports, the judge would have sought independent medical psychiatric advice before he made his findings. In any event, we consider the dialogue to have been highly improper.
[9] The report of Dr. Scholz stated in pertinent part:

"HISTORY: Patient states she was fired from her job (unjustly), became quite emotional, hysteric, and subsequently depressional. At present she is receiving psychotherapy twice weekly and while she feels she has made some improvement still feels unable to cope. She is taking no medication.
"FINDINGS: Patient is a 29 year old female who is subdued, speaks in almost a monotone. She relates her situation in an abstract and detached manner. States that she should never trust men again (presumably her former employer) and that her being laid off has harmed her career and destroyed her self confidence." (Italics added.)
None of the emphasized matter in the Scholz report was stated in the certificate of Dr. Rosenstein filed on December 7, 1978, or in his November 1979 report. We note too there is nothing in the Scholz report which suggests "Dizziness, nausea and jumps and shakes at noises" or that Ms. Kemp detailed to him any "harassment, pressures and tensions," on the job.
[10] Ms. Kemp testified at the trial she had gained 80 pounds since her termination at Volt.
[11] There is in the record testimony that Ms. Kemp was "skirtedly enticed" by Mr. Einstein, Volt's manager, and her sister but any fair reading of other contradictory statements made by her and her direct admission to Dr. Walters, "Her supervisor ... had hired her" without Mr. Einstein's testimony to the contrary all the inherent probabilities of her testimony on this subject point infallibly to the conclusion she was hired by her sister. We cannot accept her suggestion that Mr. Einstein had anything to do with the fact that she was hired. This is not to say that Mrs. Brumley, supervisor for Volt, did not have the authority to hire. This action, however, is not one for a wrongful breach of contract, oral or written, nor would any of the evidence sustain that there was such a breach.

Applicant testified:
"Q. You said that you had a problem with Mr. Einstein not speaking directly to you about some questions regarding your work, that he would speak to another person. Was that person that he spoke to a Mrs. Brumley?
"A. That was my direct supervisor after Steve Chapman had been promoted, and most of it funneled through her or through Steve; it depended.
"Q. Was Mrs. Brumley your sister?
"A. She is my sister.
"Q. So most of this information that you found out about Mr. Einstein's problems with your work came to you from your sister?
"A. Came to me through my supervisor, whom Ike Einstein hired, who was my immediate supervisor, and all directives that came down from him she told me, came through her mouth."
[12] At the trial, Mr. Einstein explains how this meeting occurred and he testified:

"A. I reported a lot of problems to Maxine Brumley, not only Myrna but of other instances and other people.
"Q. What was your reason for terminating Miss Kemp?
"A. Maxine left us, but before she had left us she had guaranteed, or at least verbally guaranteed that there would be definite improvement in the production orders that flowed from her sister to the shop in the back. But that did not materialize. There was still a constant problem in that they were not written correctly, information was not transferred like it should have to the production departments. After Maxine left us for another job  she quit on her own  there was a short period of time before I could bring in another supervisor, so I had to assume the duties of Maxine, and I just could not any longer tolerate the work orders going back into the production area incorrectly. 
". . . . . . . . . . . . . . . . . .
"A. The only way I could learn the orders were written incorrectly  because I did not check the orders, each and every one of them, because we deal with something like 50 to 60 orders a day  was from criticism of the customers over the phone to me, or the production manager in the back relaying that information to me.
"Q. Did you have any written contract with Miss Kemp?
"A. I have no written contracts with anyone.
"Q. By `anyone,' any employees?
"A. I have no written contract with any of my employees; I never had; I don't have it today. The fact that Myrna was hired by Maxine  I did not hire Myrna. I don't hire for the individual managers, as far as the individual is concerned, that is up to the individual manager. I don't normally fire and I don't normally hire. As I said, there was this brief period of time, because Maxine had left without giving me notice, that I was the one put in charge, and I had to do the job.
"Q. Did you have any understanding with Miss Kemp of any particular period of time that she would be employed by you?
"A. No, there are no guarantees. I don't even have a guarantee....
"Q. And you weren't very happy about Maxine Brumley leaving your firm without giving notice; is that right?
". . . . . . . . . . . . . . . . . .
"A. You will find in our line of work that this is customary. You will find that during the three years that I had been employed at Volt that most employees leave without giving notice.
". . . . . . . . . . . . . . . . . .
"A. No, I wasn't. I didn't dare be upset, because she went to work for one of my customers.
"Q. And I am sure it had no effect whatsoever on your attitude toward Myrna Kemp, that Maxine Brumely [sic] had just quit without giving you notice?"
[13] The emphasized lines are testimony of a subjective reaction. If in fact Mr. Einstein had hired her and begged her to come to Volt, it would appear that the occasion to which she was testifying would have been the time to express her emotional reactions and remind him of why he was treating her "very wrongly."